UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                              Case No.: 16-21608-BKC-JKO
                                                    Chapter 7
**EXCELIUM MANAGEMENT, LLC**

      Debtor.                                   /

SCOTT N. BROWN, as Chapter 7
Trustee of the Bankruptcy Estate                    Adv. Pro. No. _____
of Excelium Management, LLC,

      Plaintiff,

v.

DIANE SUGIMOTO; MICHAEL
CHHABRA; SUSHMA CHHABRA;
SABINA FARUQUI; NAJMUS
FARUQUI; and ASSET EQUITY
CAPITAL, INC., a Florida corporation,

      Defendants.
      _____/

## COMPLAINT

Plaintiff, Scott N. Brown, solely in his capacity as Chapter 7 trustee of the bankruptcy estate of Excelium Management, LLC (the "Plaintiff" or the "Trustee"), by and through undersigned counsel, sues Defendants, DIANE SUGIMOTO ("Diane"), MICHAEL CHHABRA ("Michael"), SUSHMA CHHABRA ("Sushma"), SABINA FARUQUI ("Sabina") (collectively referred to as the "Officer Defendants"), NAJMUS FARUQUI ("Najmus"), and ASSET EQUITY CAPITAL, INC., a dissolved Florida corporation ("AEC"), and in support thereof alleges as follows:

Case No. 16-21608-BKC-JKO
Adv. Pro. No._____

**Jurisdiction and Venue**

1. This is an adversary proceeding seeking damages for breaches of fiduciary duties and unjust enrichment and to avoid a fraudulent transfer.

2. The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under the Bankruptcy Code. This Court also has jurisdiction under 28 U.S.C. § 1334(e) as this adversary proceeding involves property of the Debtor's estate.

3. The Court's jurisdiction over this matter is core pursuant to 28 U.S.C. § 157(b) and the Trustee consents to the entry of final orders and judgment by the Bankruptcy Court.

4. Venue of this proceeding is properly before the Court pursuant to 28 U.S.C. § 1409.

**Parties**

5. The Trustee is the duly-appointed Chapter 7 trustee of the bankruptcy estate of the Debtor, Excelium Management, LLC (the "Debtor" or "Excelium"), and brings this action solely in his capacity as Trustee.

6. Upon information and belief, Diane is a resident of Miami-Dade County, Florida, and is *sui juris*.

7. For all times relevant to this complaint, Diane was the Debtor's Chief Financial Officer (CFO), a member of its Board of Directors, and had signature authority on the Debtor's bank accounts. In addition, Diane was the Debtor's managing member until July 27, 2016.

8. Upon information and belief, Michael is a resident of Broward County, Florida, and is *sui juris*.

9. For all times relevant to this complaint, Michael was the Debtor's Chief Operating Officer (COO), and, upon information and belief, a member of its Board of Directors.

10. For the majority of his tenure as COO, Michael was a student at The Ohio State University and oversaw the Debtor's operations remotely from Columbus, Ohio.

11. Upon information and belief, Sushma is a resident of Broward County, Florida, and is *sui juris*.

12. For all times relevant to this complaint, Sushma was a member of the Debtor's Board of Directors, had a controlling ownership interest in the Debtor via her majority interest in Family Office GP, and replaced Diane as the Debtor's managing member on July 27, 2016.

13. Upon information and belief, Sabina is a resident of Broward County, Florida, and is *sui juris*.

14. For all times relevant to this complaint, Sabina was the Debtor's Senior Vice President, a member of its Board of Directors, and had authority to initiate transfers from the Debtor's bank accounts.

15. Upon information and belief, Najmus is a resident of Broward County, Florida, and is *sui juris*.

16. Najmus is Sabina's spouse.

17. AEC is a dissolved Florida corporation with its principal place of business located in Broward County, Florida.

**Factual Background**

A. **The Main Case**

18. On August 24, 2016 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court, Southern District of Florida, which commenced Case No. 16-21608-BKC-JKO (the "Main Case").

19. From the Petition Date through September 29, 2016, the Debtor operated as a debtor-in-possession.

20. On September 22, 2016, the United States Trustee filed an Expedited Motion to Dismiss or Convert Case and Request for Expedited Hearing (ECF No. 22)(the "Trustee Motion").

21. At the hearing on the Trustee Motion, this Court directed the appointment of a Chapter 11 trustee, and thereafter, on September 27, 2016, this Court entered its Order Directing the Appointment of a Chapter 11 Trustee (ECF No. 28).

22. On September 29, 2016, the UST appointed Kenneth A. Welt as Chapter 11 trustee (see ECF No. 33). Sometime thereafter, it was determined that Mr. Welt had a conflict, and he resigned as Chapter 11 trustee.

23. On September 30, 2016, Scott N. Brown was appointed as Successor Chapter 11 trustee of the Debtor's bankruptcy estate (ECF No. 37).

24. On October 5, 2016, the Chapter 11 Trustee filed his Emergency Motion to Convert Case to Chapter 7 (ECF No. 45)(the "Motion to Convert").

25. On October 11, 2016, the Court conducted a hearing on the Motion to Convert following which it entered its Order Granting Chapter 11 Trustee, Scott N. Brown's Emergency Motion to Convert Case to Chapter 7 (ECF No. 57)(the "Conversion Order").

26. Shortly thereafter, on October 11, 2016, Scott N, Brown was appointed as Chapter 7 trustee of the Debtor's bankruptcy estate (*see* ECF No. 59).

27. Following his appointment, the Trustee and his professionals, among other things, began a comprehensive review of the Debtor's books and records and investigating the Debtor's business transactions and potential avenues of recovery for the estate.

### B. The Debtor's Pre-Petition Business

28. The Debtor was formed on October 24, 2014.

29. The Debtor is 100% owned by Excelium Holdings, LLC and is part of a consolidated tax group that includes the Debtor, Excelium Media, LLC, Law Firm Headquarters, LLC, and Online Education Ventures, LLC (the "Affiliated Entities").

30. Prior to the Petition Date, the Debtor, among other things, operated a call center located at 1000 Corporate Boulevard, Floors 5 & 6, Ft. Lauderdale, FL 33334.

31. The Debtor was formed as to act as shared services entity to, among other things, undertake human resources, accounting, payroll, technical, and other services for, among others, the Affiliated Entities.

32. Upon the execution of a Shared Services Agreement, the Debtor was authorized to take virtually limitless managerial and administrative actions on the counter-parties' behalves, including, but not limited to, the payment of invoices and the receipt of monies tendered in payment of receivables.

33. One of the primary purpose of the Debtor's call center business was to generate leads for mass tort cases, primarily those relating to transvaginal mesh litigation, which was the specialization of Law Firm Headquarters, LLC (an Affiliated Entity).

34. The Debtor lacked a reliable system to, among other things, track revenues owed from the Affiliated Entities or the expenses paid by the Debtor on their behalf.

35. This lack of oversight was extremely detrimental to the Debtor as it led to, among other things, declining revenues, a lack of accountability for the Affiliated Entities, and ultimately, the Debtor's financial demise.

36. The Debtor's only major influx of cash occurred on or about July 21, 2015 when, for unknown reasons, the Officer Defendants directed or permitted $17,000,000 from Law Firm Headquarters, LLC (an Affiliated Entity) to be deposited into the Debtor's bank account.

37. In the thirteen months that followed, the Debtor—with the Officer Defendants at the helm—entered into numerous, poorly-conceived transactions with no legitimate business purpose, which ultimately led the Debtor into bankruptcy.

38. Many of the Officer Defendants' decisions with respect to the Debtor and its funds were premised on the anticipated receipt of substantial cash infusion from Atalaya Capital Management LP ("Atalaya").

39. For much of 2015, the Officer Directors were engaged in discussions and due diligence with Atalaya regarding an advance of approximately $200 million in loan proceeds to be secured by the Debtor and/or Law Firm Headquarters, LLC's future interest in transvaginal mesh mass tort litigation cases (the "Atalaya Loan").

40. The Officer Directors improperly and unreasonably presumed that the Atalaya Loan was all but certain and began down a path of poorly-conceived business decisions and transactions with money not yet in the Debtor's possession.

41. Ultimately, in late 2015, Atalaya terminated the negotiations and walked away.

42. By that time, and without the $200 million cash infusion they had all but taken for granted, the Officer Defendants had left the Debtor in financial ruin.

C. **Random Transfers to Affiliated Entities**

43. Between the receipt of the $17,000,000 on July 21, 2015 and the Petition Date, the Officer Defendants directed or allowed the transfer millions of dollars of Debtor funds in

round sums back and forth between the Affiliated Entities and additional entities within the Excelium group or otherwise owned or controlled by the Officer Defendants.

44. Apart from the Affiliated Entities, recipients of these funds include CareHQ, Inc., Swiss Allied Corporate Services, Inc., Pharmacy Headquarters, LLC, Asset Equity Capital, Inc., and Fidelity Health PNC, LLC (the "Other Related Entities").

45. The Officer Defendants would move the Debtor's money around wherever and whenever it was needed without implementing proper accounting procedures to track which transfers were loans, which were capital infusions, and which were payments for some other purpose.

46. Moreover, the Officer Defendants did not generally require the Affiliated Entities or the Other Related Entities to execute promissory notes and did not pursue collection efforts for loans made by the Debtor at their direction.

47. All told, the Officer Directors' failure to properly account for and request timely reimbursement for funds loaned by the Debtor resulted in the $6,582,946.16 in "doubtful or uncollectable" accounts receivable listed by the Debtor on line 11 of its Schedule A/B [Main Case ECF 106].

48. The Affiliated Entities and Other Related Entities have no present ability to repay the Debtor.

**D. <u>The Physician Preferred Pharmacy Purchase and Subsequent Payroll Loans</u>**

49. In the fall of 2015, the Officer Directors directed or allowed $350,000 of Debtor funds to be used to make a down payment for the stock purchase of an entity called Physician Preferred Pharmacy, Inc. ("PPP"), which was owned by Lori Kaplan ("Kaplan")

50. On October 1, 2015, Kaplan entered into a Stock Purchase Agreement with Diane's daughter, Sara Byers ("Byers").

51. The Debtor is not a party to the Stock Purchase Agreement.

52. The Stock Purchase Agreement required Byers to make a $350,000 initial payment to purchase Kaplan's stock in PPP. $100,000.00 of the initial payment was to be paid to Kaplan and $250,000.00 was to be paid to a pharmaceutical trade creditor of PPP as directed by Kaplan.

53. But Byers did not make the initial payment, the Debtor did.

54. Specifically, on October 1, 2015 and October 6, 2015, the Officer Directors directed or allowed the Debtor's general counsel to transfer Debtor funds being held in his trust account: (a) directly to Kaplan in the amount of $100,000.00; and (b) to JM Smith Corporation in the amount of $250,000.00 (the "Pharmacy Purchase Transfers").

55. The Debtor was not obligated to make the Pharmacy Purchase Transfers.

56. The Debtor's books and records do not reflect that the Debtor received any value in exchange for the Pharmacy Purchase Transfers.

57. The purchase of PPP—let alone by Byers rather than the Debtor—did not serve any legitimate business purpose for the Debtor.

58. Rather, the Officer Defendants directed or allowed Byers to purchase PPP for herself using Debtor funds.

59. In further derogation of their fiduciary duties to the Debtor, between October 28, 2015 and June 22, 2016, the Officer Defendants directed or allowed the Debtor to loan an aggregate sum of $200,000 to PPP to cover its payroll costs without any obligation to do so,

without receiving any value in exchange for the loan, without requiring a promissory note, without pursuing repayment of the loaned funds, and for no legitimate business purpose.

### E. Similar Payroll Loans and Transactions with American High School

60. In 2015, Online Education Ventures, LLC (an Affiliated Entity) engaged in a joint venture with an entity called American High School.[1]

61. The Debtor had no direct agreement with American High School.

62. As with the other Affiliated Entities, Online Education Ventures, LLC was party to a Shared Services Agreement with the Debtor, which allowed the Debtor to commandeer its day-to-day affairs.

63. In mid-2015, American High School began to struggle financially and was unable to meet its payroll obligations.

64. For unknown reasons, the Debtor—without any obligation to and without requiring a promissory note—began loaning money to American High School to cover its payroll and other overhead costs.

65. In addition, the Debtor began collecting all of American High School's revenues, presumably on behalf of Online Education Ventures, LLC, and disbursing 50% of those revenues back to American High School.

66. The Officer Defendants failed to implement a reliable accounting system to determine which payments to American High School were loans and which were revenue disbursements.

---

[1] American High School is an online high school owned by third parties and operated as an enterprise of three separate entities: American High School, LLC, Intervisual Technology, Inc., and Intervisual Education Management Services of Florida, LLC. Collectively, these three entities are referred to as "American High School."

67. All told, the Debtor disbursed $1,849,868.62 to American High School in the two-year period preceding the Petition Date.

68. There is no practicable way—given the Officer Defendants' failure to properly account for loans as opposed to revenue disbursements or require American High School to execute promissory notes—to determine what portion of that $1,849,868.62 is actually due and owing to the Debtor.

69. Upon information and belief and based on the Rule 2004 examination testimony of the Debtor's former controller, at least half of the $1,849,868.62 were loans from the Debtor to American High School to cover payroll.

### F. American Express Charges

70. As the Debtor, at the direction of the Officer Defendants, continued to squander money, it became dependent on the creditworthiness of Michael to finance its operations.

71. Michael obtained an account with American Express ("Amex") which was used by the Debtor for upwards of $200,000 in charges each month throughout much of 2015 and 2016.

72. Michael obtained multiple Amex cards for different card holders on his account, which were used by Michael, his girlfriend, his father, and Sabina, among others.

73. The Amex charges included many business-related expenses of the Debtor, but also the personal expenses of the various card users.

74. For example, the Amex statements reveal purchases at Cartier Aventura, tuition payments for Michael's education at Ohio State, tuition payments for Sabina's minor children at Sagemont School, a family vacation at Hawk's Cay, and a myriad of other lavish expenditures that have nothing to do with the business of the Debtor.

75. Each month, the Debtor would pay Michael's monthly Amex bill in full.

76. But the Officer Defendants never caused the Debtor to implement a reliable system to determine, among other things, which Amex charges were personal in nature, as opposed to those that were for legitimate business expenses of the Debtor.

77. In addition, the Debtor lacked adequate staff to sift through months of Amex statements to segregate personal from business expenses.

78. Rather than implement a reliable system or hire sufficient staff to account for expenses of a personal nature at the end of each month and require that the Debtor be reimbursed for such purchases, and because the Debtor almost always required the Amex account's full credit line, the Officer Defendants simply paid the Amex off in full each month and kept a running tab, of sorts, in the Debtor's books and records of what they *believed* to be the personal expenses of the Amex card users.

79. Due to the Officer Director's failure to ensure that the Debtor implemented a system to properly account and request reimbursement for personal expenses on the Amex, the tab grew to $485,114.45 as listed on Line 71 of the Debtor's Schedule A/B as the "Chhabra Family Oral Obligation" [Main Case ECF 106].

80. The Chhabra Family Oral Obligation was scheduled by the Debtor as a "doubtful or uncollectable" note receivable that remains unpaid and neither Michael, Sabina, nor any of the other parties who personally benefitted from the Debtor paying the Amex in full each month has the means to repay that $485,114.45 receivable to the Debtor.

81. Moreover, there is no practicable way—based on the Officer Defendants' failure to ensure that the Debtor implemented a system to properly account for personal Amex charges of the various card users—to determine who actually owes what portion of the $485,114.45 tab.

### G. Local Magnet Acquisition

82. In another inexplicable business blunder, on September 7, 2015, the Debtor paid $760,000 to purportedly acquire the shares of an entity called Local Magnet.

83. This acquisition—if it occurred as there is no record of an executed stock purchase agreement or any shares being transferred to the Debtor—served no legitimate business purpose.

84. If the Debtor received anything in exchange for the $760,000 purchase price, it failed to do anything with Local Magnet and the acquisition was simply a waste of the Debtor's money at the direction or allowance of the Officer Defendants.

### H. Sabina & Najmus's House

85. On September 10, 2015, the Officer Directors directed or allowed the Debtor's general counsel to transfer $862,500 in Debtor funds being held in his trust account to AEC (an Other Related Entity).

86. The $862,500 was used by AEC to fund the purchase of real property located at 2505 Montclaire Circle in Weston, Florida 33327 (the "Property").

87. Upon purchase, the Property was titled in the name of Sabina and Najmus via a warranty deed recorded in the Official Records of Broward County, Florida as instrument number 113227786.

88. AEC recorded a mortgage against the Property but, upon information and belief, Sabina and Najmus made no mortgage payments.

89. Just over three months later, on December 24, 2015, with the Debtor strapped for cash after the Atalaya Loan had fallen through, the Property was sold for only $600,000—

$568,319.87 of which was directed to AEC after closing—and AEC forgave the deficiency balanced owed by Sabina and Najmus and recorded a satisfaction of mortgage.

90. Sabina and Najmus remained in the Property as tenants of the new owners and, upon review of public records, now own the Property through an entity called 2505 Montclaire Circle, LLC, which itself is 100% owned by Najmus.

91. Accordingly, the Debtor—under the direction of the Officer Defendants—advanced Debtor funds to purchase an $862,500 home for Sabina and Najmus in exchange for nothing (the "$862k Transfer").

92. Sabina and Najmus continue to reside in the Property to this day without ever having compensated the Debtor for the $862k Transfer.

## COUNT I
## **BREACH OF FIDUCIARY DUTY**
*(Against the Officer Defendants)*

93. Plaintiff re-alleges paragraphs 1 through 92 as if fully set forth herein.

94. At all times material hereto, the Officer Defendants were officers, directors, and/or managers of the Debtor. As such, the Officer Defendants owed the Debtor and its creditors fiduciary duties, including the duty of care and the duty of loyalty.

95. The Officer Defendants had an obligation to discharge their duties in good faith with the care an ordinarily prudent director or officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtor and its creditors, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill their duty to monitor the activities of management.

96. The Officer Defendants exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of the Debtor and its creditors.

97. The Officer Defendants breached their fiduciary duties owed to the Debtor and its creditors by, among other acts or omissions:

    a. failing to implement appropriate internal controls over, among others, the Debtor's finances;

    b. failing to timely take action to mitigate or remedy known problems involving the Debtor's finances;

    c. failing to conserve and manage the assets of the Debtor;

    d. failing to pursue collection of receivables owed to the Debtor;

    e. engaging in transactions that appear to have provided a benefit solely to some or all of the Officer Defendants or their family members, but to the detriment of the Debtor; and

    f. grossly mismanaging the business and financial affairs of the Debtor.

98. The acts and omissions of the Officer Defendants were adverse to the best interests of the Debtor and its creditors, and were neither intended to confer, nor conferred, any benefit upon the Debtor.

99. As a direct and proximate result of the breaches of fiduciary duty of the Officer Defendants, the Debtor was rendered insolvent and forced into bankruptcy.

100. The Debtor's creditors have substantial claims against the Debtor's estate totaling at least $5,189,720.59.[2]

101. The cause of action alleged in Count I is property of the Estate pursuant to 11 U.S.C. § 541 and properly brought by the Trustee in his capacity as Chapter 7 trustee of the Debtor's estate.

**WHEREFORE**, Plaintiff, Scott N. Brown, as Chapter 7 trustee of the bankruptcy estate of Excelium Management, LLC, demands judgment against the Officer Defendants, jointly and

---

[2] There is at least one potentially substantial, but unliquidated claim in an amount to be determined. *See* Main Case, Claim 62-1.

severally, for compensatory damages in the amount of at least $5,189,720.59, plus pre-judgment interest, court costs, and post-judgment interest at the applicable statutory rate, and for such other and further relief as this Court deems appropriate.

### COUNT II
### AVOIDANCE OF FRAUDULENT TRANSFER
### PURSUANT TO SECTION 548(a)(1)(B) OF THE BANKRUPTCY CODE
*(Against Sabina, Najmus, and AEC)*

102.    Plaintiff re-alleges paragraphs 1 through 42 and 85 through 92 as if fully set forth herein.

103.    The $862k Transfer was made to AEC by the Debtor and for the benefit of Sabina and Najmus, within the two-year period immediately preceding the Petition Date.

104.    The Debtor received less than a reasonably equivalent value in exchange for the $862k Transfer.

105.    Upon information and belief, the Debtor was insolvent at the time the $862k Transfer was made or was rendered insolvent as a result of the $862k Transfer.

106.    Upon information and belief, at the time of the $862k Transfer, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

107.    Upon information and belief, at the time of the $862k Transfer, the Debtor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

**WHEREFORE**, Plaintiff, Scott N. Brown, as Chapter 7 trustee of the bankruptcy estate of Excelium Management, LLC, respectfully requests this Honorable Court enter a judgment: (i) determining that the $862k Transfer is fraudulent and avoidable pursuant to 11 U.S.C. § 548(a)(1)(B); (ii) avoiding the $862k Transfer pursuant to 11 U.S.C. § 548(a)(1)(B); (iii)

disallowing any claim that AEC, Sabina, or Najmus may have against the estate until such time as they repay the amount of the $862k Transfer to the Trustee pursuant to 11 U.S.C. § 502(d); and (iv) granting such other and further relief as the Court deems just and proper.

### COUNT III – RECOVERY OF PROPERTY PURSUANT TO SECTION 550 OF THE BANKRUPTCY CODE
*(Against Sabina, Najmus, and AEC)*

108. Plaintiff incorporates by reference and realleges paragraphs 1 through 42, 85 through 92, and 103 through 107 as if fully set forth herein.

109. The $862k Transfer is avoidable by the Trustee pursuant to 11 U.S.C. § 548 and is therefore recoverable by the Trustee pursuant to 11 U.S.C. § 550.

110. AEC is the initial transferee of the $862k Payment.

111. Sabina and Najmus were the persons for whose benefit the $862k Transfer was made.

**WHEREFORE**, Plaintiff, Scott N. Brown, as Chapter 7 trustee of the bankruptcy estate of Excelium Management, LLC, respectfully requests this Honorable Court enter a judgment: (i) determining that the $862k Transfer is recoverable by the Trustee pursuant to 11 U.S.C. § 550; (ii) for damages against Sabina and Najmus, jointly and severally, in the amount $862,500 plus pre-judgment interest, court costs, and post-judgment interest at the applicable statutory rate; and (iii) granting such other and further relief as the Court deems just and proper.

### COUNT IV UNJUST ENRICHMENT
*(Against Sabina and Najmus)*

112. Plaintiff incorporates by reference and realleges paragraphs 1 through 42 and 85 through 92 as if fully set forth herein.

113. This count is pleaded in the alternative to the relief sought in Counts II and III.

Case No. 16-21608-BKC-JKO
Adv. Pro. No._____

114. Upon information and belief, Sabina and Najmus knowingly and voluntarily requested the $862k Transfer to be made by the Debtor.

115. Sabina and Najmus have had use and benefit of the $862k Transfer from the Debtor, but have not repaid or compensated the Debtor for same.

116. The Debtor conferred a benefit on Sabina and Najmus and a clear benefit has flowed to Sabina and Najmus in the form of the $862k Transfer.

117. Sabina and Najmus accepted and have retained the benefit conferred on them by the Debtor in the form of the $862k Transfer.

118. Under the circumstances, it would be inequitable for Sabina and Najmus to retain such benefit without paying the value thereof.

119. Sabina and Najmus have been unjustly enriched by obtaining the benefit of the $862k Transfer from the Debtor and failing to repay or compensate the Debtor for same.

120. As a result of the unjust enrichment of Sabina and Najmus, Plaintiff has been damaged in the amount of $862,500, plus prejudgment interest.

121. The cause of action alleged in Count IV is property of the Estate pursuant to 11 U.S.C. § 541 and properly brought by the Trustee in his capacity as Chapter 7 trustee of the Debtor's estate.

**WHEREFORE**, Plaintiff, Scott N. Brown, as Chapter 7 Trustee of the Bankruptcy Estate of Excelium Management, LLC., respectfully requests this Honorable Court enter judgment against Sabina and Najmus: (i) awarding damages in the amount of $862,500, plus pre-judgment interest, court costs, and post-judgment interest at the applicable statutory rate; and (ii) granting such other and further relief as the Court deems just and proper.

Case No. 16-21608-BKC-JKO<br>Adv. Pro. No._____

Dated: August 22, 2018.

        BAST AMRON LLP
*Counsel for Scott N. Brown, Chapter 7 Trustee*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: zlaux@bastamron.com

By: _/s/ Zakarij N. Laux_
      Zakarij N. Laux, Esq. (FBN 093784)